1      Q    Okay.

2           MR. KATZ:  Neil, I would ask that those

3    tax returns be made available.

4           MR. HYMAN:  You want 2007 and 2008?

5           MR. KATZ:  Yes.

6           MR. HYMAN:  Okay.

7           THE WITNESS:  If I -- I'll try to find

8    them all.

9           MR. HYMAN:  All right.

10          Q    In regard to Argo Enterprise --

11          A    No, that was Argo Management just

12   before, right?

13          Q    Right.  In regard to Argo Enterprise, in

14   2007 did it have over $500,000 in gross receipts?

15          A    For Enterprise?

16          Q    Yes.

17          A    No, in 2007 we were, we had zero

18   balance.

19          Q    Okay.  In 2008 did Argo Enterprise have

20   $500,000 in gross receipts?

21          A    No.

Page 92

1          MR. KATZ:  Neil, I would ask that the

2    tax returns also for Argo Enterprise for those two

3    years be made available.

4          MR. HYMAN:  We'll get them.

5          MR. KATZ:  Okay.  Thank you.

6          MR. HYMAN:  I assume they exist.  So

7    subject to their existence we'll produce them.

8          MR. KATZ:  Thank you.

9    A    I suppose they exist as well.

10   Q    Do they exist?

11   A    You see the originality of my companies,

12   that they are real and therefore they should exist,

13   I do pay taxes.  If I pay taxes, therefore the

14   declaration should exist as well.

15         MR. HYMAN:  We'll talk about it when

16   we're done.

17         BY MR. KATZ:

18   Q    When you took -- strike that.

19         In December of 2007 when you say your

20   companies took over for the prior company, did you

21   receive any paperwork from Lunil regarding any of

1          MR. HYMAN:  He will be able to answer it

2    or we'll tell you who will.

3          Q    Now, Mr. Abgaryan, would Argo Management

4    or Argo Enterprise have some type of folder or file

5    that includes any documents, employment

6    application, tax forms, et~cetera that were filled

7    out by Mr. Norris?

8          A    There should be.

9          Q    Where are those kept?

10          A    Third shelf from the bottom in the steel

11    case.

12          Q    In your office?

13          A    Naturally so.

14          Q    And is that where you maintain personnel

15    files, personnel documents for other Argo

16    Management or Argo Enterprises employees?

17          A    No, that's the archive.

18          Q    Where is the archive?

19          A    On the third floor of the steel case.

20    There are five of them all in a row.  So the third

21    one is, the third section is the archives.

Page 128

1    Q    Are you talking about a file cabinet?

2    A    Yes, absolutely.

3    Q    That's also in your office?

4    A    Naturally.

5         MR. KATZ:  Counsel, I'm going to ask you

6    to have your client look in his file cabinet or

7    cabinets or any other repository of documents for

8    the personnel file of any plaintiff and to produce

9    the file tomorrow morning.

10        MR. HYMAN:  Do you understand?

11        THE WITNESS:  Yes, okay.

12        MR. KATZ:  Off the record.

13        (Discussion held off the record.)

14        BY MR. KATZ:

15   Q    Mr. Abgaryan, in numbered paragraph

16   number 2 in Exhibit 11 there is a reference to --

17        MR. HYMAN:  Paragraph 2.

18   A    Oh, 2.

19   Q    I'm going to read a sentence and ask you

20   what it means.  It says number 2, personnel.  Argo

21   Enterprises, Inc. shall cause the services to be

Page 150

```
 1      A    When was the time?

 2      Q    The lawsuit was filed I believe at the

 3  end of January 2008.

 4      A    Not quite certain but most probably I

 5  started doing it electronically at the beginning of

 6  January 2008, hence before I was sued.

 7      Q    Okay.  So that would have been within a

 8  couple of weeks when you, after you started

 9  supplying -- strike that.  So that was essentially

10  a -- strike that again.  So that was within a

11  couple of weeks of December 17th, 2007?

12      A    Yeah, as soon as I figured it all out

13  and yes, it was probably at the very beginning of

14  January, yes.

15      Q    So is it your testimony that you

16  received these time records from MHTS for at most a

17  couple of pay periods?

18      A    I think, I think, yes.

19      Q    Okay.  And where are those documents?

20      A    I don't know.

21      Q    Did you keep them?
```

```
 1       A    I am not sure.  I'll check.

 2       Q    Okay.

 3            MR. KATZ:  Can we add that to the list

 4   of documents that the witness is going to look for

 5   this evening?

 6       A    You already asked me for that document

 7   so if I had it I most likely have provided it.

 8       Q    Do you think you threw the document

 9   away?

10       A    Not -- I might have tossed it even

11   purposefully as soon as I learned the electronics

12   scanned them into my computer.  Probably.  That's

13   not for sure.

14       Q    You stated that you, since approximately

15   January of 2008, received the information regarding

16   how many hours each employee worked at MHTS

17   electronically.

18       A    Yes.

19       Q    In what form do you receive that

20   information?

21       A    First name, last name, table number,
```

Page 152

1    table number, and then weekdays, Monday, Tuesday,

2    Wednesday, and the number of hours and then the

3    next week and then it will give me the total amount

4    of hours for the periods.

5         Q    Do you receive that information for all

6    of the employees you have, you have one document or

7    are there separate documents for each employee to

8    pay on one document?

9         A    For all employees.

10        Q    In one document?

11        A    Yes.  But for each company individually.

12        Q    What do you mean by that?

13        A    Argo Enterprise and Management.

14        Q    Okay.  Do you maintain those documents

15   on your computer?

16        A    Yes, of course.

17        Q    Okay.

18             MR. KATZ:  Counsel, can you please

19   produce all documents --

20             MR. HYMAN:  I think we already have.

21             MR. KATZ:  Wait.  Please produce all

1    documents showing the hours worked at the MHTS

2    facility by employees of Argo Enterprise and Argo

3    Management Group that are maintained on the

4    witness' computer.

5              MR. HYMAN:  Okay.

6         A    I don't think that it pertains to this

7    particular case.

8         Q    Okay.  Your testimony was that people

9    who work at the Mayflower laundry punch in and out

10   on a time clock.

11        A    What time clock are we talking about?

12        Q    You referred to employees punching in

13   and out using their finger.

14        A    Yes.  Just the terminology.

15        Q    Where is that time clock located?

16             THE INTERPRETER:  By time clock you mean

17   the actual machine or sheets?

18        Q    Okay.  Just to clarify, I use the term

19   time clock to indicate some type of mechanism which

20   the employee has to touch to record his or her

21   time.

MANCIA, et al v. MAYFLOWER TEXTILE SERVICES CO., et al   VALENTIN AGHAYAN - VOLUME 3   3/17/2009

Page 190

1    them to locate that document.

2        Q    Thank you.

3            MR. PELLETIER:  Dan, which document are

4    we talking about?

5            MR. KATZ:  The contract between Argo

6    Management Group and MHTS that preceded the Exhibit

7    Number 12, which is the contract dated January 2nd,

8    2008.

9        Q    And again just reviewing what documents

10   you've produced this morning, is it correct that

11   you have produced invoices from Argo Management

12   Group to MHTS?

13       A    Yes.

14       Q    And the dates on these documents from

15   first glance appear to be from January 3rd, 2008 to

16   March 13th, 2009.

17       A    The first glance, the second, the ninth,

18   the tenth, whichever ones.

19       Q    These invoices that you produced this

20   morning, when were these printed?

21       A    Last night.

Page 191

1    Q    Did you print them?

2    A    No.

3    Q    Who did?

4    A    The printing machine.

5    Q    Mr. Abgaryan, I'm going to ask you not

6    to -- strike that.  I'm going to ask you to answer

7    my questions and I'm sure you are aware that when I

8    ask who printed them I'm asking about an

9    individual.  I'm going to ask you to please answer

10   my questions.

11        Now, the question is who printed them?

12   A    Who, me.

13   Q    Thank you.

14   A    You're welcome.

15   Q    Prior to printing these invoices, did

16   you make any changes on the invoices from how this

17   data existed prior to last evening?

18   A    No.

19   Q    For the period of time represented by

20   these invoices from January 3rd, 2008 to March 13,

21   2009 are there any other invoices or billing

Case 1:08-cv-00273-CCB    Document 101-6    Filed 05/15/2009    Page 11 of 24

MANCIA, et al. v. MAYFLOWER TEXTILE SERVICES CO., et al.    QUENTIN ABGARYAN - VOLUME 2  3/27/2009

Page 192

1    records from either Argo Management Group or Argo

2    Enterprises to MHTS?

3        A    No.

4                (Exhibit 20 marked.)

5        Q    Would you please look at Exhibit Number

6    20?

7                (Pause for document review.)

8        Q    Mr. Abgaryan, is it correct that the

9    documents in Exhibit Number 20 you produced this

10   morning?

11               THE INTERPRETER:  Is it correct?

12               MR. KATZ:  Yes.

13       A    Yes.

14       Q    Okay.  When were these documents

15   printed?

16       A    Last night.

17       Q    Did you print them?

18       A    Yes.

19       Q    Can you tell me what these documents

20   are?

21       A    Those are time sheets.  They're excerpts

1    from time sheets.

2         Q    What do you mean they're excerpts from

3    time sheets?

4         A    Time sheet is a little bit longer so

5    it's -- those are for individuals that you, Mr.

6    Katz, were interested in.

7         Q    In other words, these are not -- let me

8    strike this.

9              You said these are time sheets.

10   Where -- the information that is on these records,

11   where did you, how did you receive that

12   information?

13        A    Well, that is based on the information,

14   the time sheets that as I explained it to you I

15   get, from yesterday, I explained to you I get from

16   MHTS and based on these time sheets I calculate the

17   compensation.

18        Q    Okay.  The time sheets that you receive

19   from MHTS, are they on your computer?

20        A    Yes.

21        Q    Okay.

Page 194

1              MR. KATZ:  The instruction and the

2    requirement is that the information that is on Mr.

3    Abgaryan's computer that contains this time be

4    produced.  The instruction, the document request

5    and what plaintiffs believed to be the agreement we

6    had yesterday is that that information would be

7    produced as it existed on Mr. Abgaryan's computer

8    and not that the information would be edited by the

9    witness prior to production.

10      A     Nobody can instruct me what to do with

11   my papers.  These are my documents and I will do as

12   I please.

13             MR. KATZ:  Mr. Hyman, the information

14   that the witness identified existed on his computer

15   is information, specifically the hours worked by

16   individuals at the laundry transmitted by MHTS to

17   Argo which contains their names and the hours they

18   worked and each day they worked, that information

19   has to be produced as it is maintained on

20   defendant's computer in a manner in which defendant

21   receives that information.  That information has

Page 212

1    Katz that after convening with my attorney I am in

2    agreement with you I will produce the time sheets.

3         Q     Thank you.  The third to last page of

4    Exhibit Number 20.

5              MR. HYMAN:  This one, okay.

6         Q     Which has, the top right-hand side it

7    says MHTS Argo 54.  So that we're on the same page.

8         A     Yes.

9         Q     At the bottom left-hand corner of the

10   page it says prepared by Arvind Limachia.

11        A     Yes.

12        Q     Who is Arvind Limachia?

13        A     He used to be an employee of MHTS and

14   I'm not quite sure what his position and

15   responsibilities were but if I'm not at all

16   mistaken, I think it was similar to Borman.

17   Maybe -- Anna, so it was simply to what she was

18   doing.

19              THE INTERPRETER:  I think it's Borman.

20   I don't know.

21        Q     This page at the bottom says prepared by

MANCIA, et al. v. MAYFLOWER TEXTILE SERVICES CO., et al.   VALENTIN ABGARYAN - VOLUME 2, 1/7/2009

Page 216

```
 1              MR. HYMAN:  All right.

 2              (Recess from 11:18 to 11:27 a.m.)

 3              MR. HYMAN:  I had my heart operated on

 4       in January of this year.

 5              MR. KATZ:  Plaintiffs' request was that

 6       the records that are going to be produced be

 7       produced a half hour before the deposition so as

 8       best as possible if those records can be in here by

 9       9 so that we don't hold everyone up.

10              MR. HYMAN:  Yeah, okay.  For the record

11       in addition to the documents that we discussed, and

12       having been through Plaintiffs' 17, 18 and 19,

13       which are document requests to Argo Enterprises,

14       Argo Management Group, and Valentin Abgaryan, we

15       expect to be able to produce written job

16       descriptions, W-2s for the plaintiffs, and 1099s

17       for Mr. Carias, I don't know if that's Ms. or Mr.

18       Mendez, and Mirta Avalos, who have been identified

19       as contractors.

20              MR. KATZ:  Thank you.  Are there any

21       other responsive documents, any other documents
```

Page 260

1       Q     Do you know who at MHTS I might ask to

2    produce those job descriptions?

3       A     I have no idea.

4       Q     Were you able to locate any W-2s or

5    1099s for the plaintiffs in this matter?

6       A     I do have them, they were just not

7    accessible yesterday to me.  I just need to have a

8    daily window to attend to those matters and get to

9    the office in the daytime.

10      Q     Are those records available in your

11   office?

12      A     Yes.

13            MR. KATZ:  Counsel, I would ask that

14   they be produced as soon as possible.

15            MR. HYMAN:  And they will be.

16      Q     Another document that you have

17   identified that exists is a contract between Argo

18   Management Group and MHTS which precedes the

19   contract that is Plaintiffs' Exhibit Number 11.

20                  (Document tendered.)

21            MR. HYMAN:  No, it's actually Number 12.

MANCIA, et al. v. MAYFLOWER TEXTILE SERVICES CO., et al.
VALENTIN ABUGHRYAN - VOLUME 2, 4/1/2009

Page 262

1        Q      Thank you.

2        A      You're welcome.

3        Q      One question that came up on Monday was

4    I asked you if you had any information of any of

5    your employees, meaning employees of either Argo

6    Enterprise or Argo Management Group or your

7    employees, being transferred from the Baltimore

8    laundry to the Belcamp laundry or from the Belcamp

9    laundry to the Baltimore laundry.

10       A      Yes.

11       Q      If I recall correctly you said you were

12   going to speak to another one of your employees

13   about this matter.  Have you been able to do so

14   and/or do you have any other additional response to

15   the question of transfer between the two laundries?

16       A      Yes, I actually got in contact with my

17   manager and requested that he or she prepare the

18   list of people who were transferred back and forth

19   from one factory to the other and vice versa.

20       Q      Do you have that list?

21       A      Unfortunately yesterday my manager was

Page 263

1   attending to the urgent repairs, two of our

2   machines broke down simultaneously so he was

3   attending to that, but I rest assure you you will

4   have the list, no problem.

5          Q    Can you give me a date by when that list

6   will be made available?

7          A    What is the date, 18th?

8          Q    Today is March 18th.

9          A    By Friday.  This Friday, this upcoming.

10         Q    Meaning March 20th?

11         A    Yes.  You have lots of Fridays, that

12   will be this Friday.

13         Q    Thank you.

14              In regard to the transfers, how is a

15   decision made -- strike that.

16              If one of your employees is working at

17   the Belcamp facility, who notifies you that there

18   is a need for another employee at the Baltimore

19   laundry?

20         A    I don't see the connection between

21   Belcamp and Baltimore.  What is the contact point?

Page 278

```
 1   Mr. Abgaryan has not kept it but Mr. Nichols and I

 2   have a list.  Subject to completing that list based

 3   on what we've given in the last couple of days we

 4   can give you the updated list in a few days.

 5              MR. KATZ:  Thank you.

 6        Q    You testified that the personnel

 7   documents that you produced yesterday, the

 8   originals of which were in front of you just a

 9   couple of minutes ago and which your counsel is now

10   showing you, your testimony was that these

11   documents were in a different drawer in your office

12   than the other documents which you produced

13   earlier.  I just want to make sure, is that what

14   you said?

15        A    Maybe it got lost in translation because

16   I already declared that I have, I have an active

17   case with files and then I have those who are not

18   employed any more and there's no third one.  If

19   you're talking about the current employees it's one

20   case, if we are talking about people who worked for

21   one day, one week, they're in the archives case.
```

Page 334

1    paid them the money, that's what they were most

2    interested in.  I understand it's a violation and

3    my motivation was not to get them nervous, the

4    workers that is.  That is it.

5         Q    Now, if you can look back at Exhibit

6    Number 31.  Is it correct that on Exhibit 31 does

7    not appear the names of numerous employees who

8    appear on the first payroll summary report which is

9    part of Exhibit 32?

10        A    Naturally so.

11        Q    And why is that?

12        A    Because this is just, number 31 is just

13   Argo Enterprise and number 32 is combined for Argo

14   Enterprises and Argo Management Group.  So hence in

15   this one you don't have Argo Management Group.

16             MR. KATZ:  Neil, will you agree to

17   provide the plaintiffs the names and addresses for

18   all of the employees whose names appear on the

19   payroll summaries which comprise Exhibits Number 32

20   so they can be sent notices of this collective

21   action as they may be eligible to participate in

Page 335

1    this litigation?

2              MR. HYMAN:  It's not coming from me.

3              THE WITNESS:  Even if you agree, I

4    disagree.  Especially since I witnessed how easily

5    my documents that I produce in a confidential

6    manner vanish.  I am not referring to Mr. Katz but

7    I really do not want some stranger digging into my

8    private papers.

9              MR. HYMAN:  Let me say this:  I will

10   discuss it with Mr. Abgaryan.

11             MR. KATZ:  Thank you.  I would

12   appreciate that.

13             Argo Management Group has been a

14   defendant if I recall since the filing of the

15   amended complaint, which I believe was filed in the

16   first part of December of 2008.  Only after the

17   production of documents this morning has the

18   defendant indicated that there were a significant

19   number of employees who worked at the Mayflower

20   laundry who, according to defendant's documents, at

21   first glance, are potential members of the

Page 353

1    question?

2              MR. KATZ:  No, I'm still going.

3              MR. HYMAN:  All right.

4        Q    Exhibit 37 appears to have additional

5    information which does not appear on Exhibit 38; is

6    that accurate?

7        A    I can tell you first and foremost it's

8    the document but the format is different.  And 38

9    is a defective version of 37.  I have no idea how

10   the defective made it over to you because it's

11   unfinished.

12       Q    Okay.  Is 37 essentially the finished

13   version of number 38?

14       A    Absolutely correct.

15       Q    And is it correct to say that both

16   documents indicate that Mirta Avalos has a rate,

17   regular hour rate of $6.05 per hour?

18       A    Yes.

19              (Exhibit 39 marked.)

20       Q    Now, if you will look at document number

21   39, this document also involves plaintiff Avalos.

Page 354

1    The second to last column indicates a rate per hour

2    of $9.50. Can you please explain this document?

3         A    I can answer now?

4         Q    Yes.

5         A    I hardly believe I provided you with

6    this document, because I was concealing

7    deliberately from you the rates I was getting from

8    MHTS. This includes the amount that MHTS pays for

9    her to me. I didn't give you that document. It's

10   your culprit.

11        MR. KATZ: Can you mark that please?

12   This will be number 40.

13             (Exhibit 40 marked.)

14        (Discussion held off the record.)

15        BY MR. KATZ:

16        Q    Reviewing document number 40, the second

17   to last column is rate per hour. It indicates for

18   Nuvia Gonzalez $9.50 per hour, Henri Sosa $10.50

19   per hour, and Miguel Mendoza $10 an hour. Is it

20   accurate to say that those are the rates for each

21   of those individuals for which you were billing

1    MHTS?

2         A    Yes.  I have a spy infiltrated at

3    headquarters.

4              MR. KATZ:  Let's take a short break.

5              (Recess from 3:22 to 3:30 p.m.)

6                 (Exhibit 41 marked.)

7              BY MR. KATZ:

8         Q    Mr. Abgaryan, you're now looking at

9    Exhibit Number 41, which is a document you produced

10   in discovery on March 16th, 2009.  This appears to

11   be a W-4 with a date of -- the form is dated 2006,

12   apparently signed by plaintiff Wilfredo Numez And

13   is dated November 30th, 2007.  Can you tell us how

14   this document came into your possession?

15        A    I didn't get it from anywhere.  I

16   created it at my office.  Why I am so certain, you

17   see this is a little askew at the bottom line and

18   that's my printer's typical malfunction.

19        Q    What line is your printer's malfunction?

20        A    All the lines.  All from here and here

21   move left.